IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GLORIA CARTER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 2020-cv-1083 |
| | ) |
| | ) |
| | ) **JURY DEMANDED** |
| CITY OF CHICAGO, an Illinois Municipal Corporation, | ) |
| | ) |
| | ) |
| Defendant. | ) |

## COMPLAINT

### INTRODUCTORY STATEMENT

1. This case is about the physical inaccessibility of the emergency homeless shelter program ("emergency shelter program") funded and operated by the City of Chicago ("Defendant"). Defendant denied Plaintiff Gloria Carter ("Ms. Carter") access to its emergency shelter program because Ms. Carter's disability prevents her from climbing stairs and climbing into inaccessible vans. Defendant violated Ms. Carter's right to be free from discrimination on the basis of her disability by failing to design, fund, and operate Defendant's emergency shelter program in a manner that would provide equivalent services to Ms. Carter and other individuals with disabilities.

2. Ms. Carter brings this complaint under Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 *et seq*. (the "ADA"), and Section 504 of the Rehabilitation Act of 1973 as amended, 29 U.S.C. § 791 *et seq*. (the "Rehabilitation Act") and seeks: (1) a declaration that Defendant's conduct constitutes illegal discrimination against Ms. Carter based on her disability; and (2) an injunction prohibiting Defendant's discriminatory conduct by

ordering Defendant to make its emergency shelter program accessible to individuals with disabilities. Ms. Carter also seeks compensatory damages for Defendant's deliberate indifference to her right to be free from this discriminatory conduct.

## JURISDICTION

3. This Court has jurisdiction over these claims pursuant to 28 U.S.C. § 1331 (conferring jurisdiction over civil actions arising under laws of the United States) since they arise out of the protections provided in Section 504 of the Rehabilitation Act and Title II of the ADA.

4. Ms. Carter's claims for declaratory and other relief are authorized by 28 U.S.C. §§ 2201 and 2202.

5. This Court is the appropriate venue under 28 U.S.C. § 1391(b) in that Defendant is subject to personal jurisdiction in this District and the events giving rise to this Complaint occurred in this District.

## PARTIES

6. Ms. Carter resides in Chicago, Illinois.

7. Ms. Carter is an individual with osteoarthritis, a condition that significantly limits her mobility. She uses a walker to get around.

8. Ms. Carter is a qualified individual with a disability under the ADA and the Rehabilitation Act.

9. Defendant City of Chicago is a municipal corporation with its principal offices located at City Hall, 121 N. LaSalle Street, Chicago, Illinois. The City of Chicago is a home rule unit of local government under the 1970 Constitution of the State of Illinois and has the authority to promote the health, safety, and welfare of its inhabitants.

10. Defendant is a "public entity" as defined by Title II of the ADA. 42 U.S.C. § 12131(1).

**DEFENDANT'S EMERGENCY SHELTER PROGRAM**

11. On information and belief, Defendant operates its emergency shelter program through its Department of Family and Support Services, which distributes funding to, and coordinates placement in, Chicago's homeless shelters.

12. To access an emergency shelter bed in Chicago, Defendant requires a person experiencing homelessness to either call 311 or go to a police station or hospital, where the staff will call 311 on their behalf.

13. After a 311 call has been made, the person seeking shelter must wait where the call was made until a delegate agency picks that person up in a van and delivers that person to a shelter facility selected by Defendant.

14. On information and belief, Pacific Garden Mission ("PGM shelter") does not receive direct funding from Defendant's emergency shelter program, but participates in the program's intake process by receiving homeless individuals the City is serving in its emergency shelter program. As the largest homeless shelter in the City, PGM shelter is one of the primary places that Defendant's delegate agency brings homeless people to when they attempt to access emergency shelter in Chicago.

15. On information and belief, except for PGM shelter, the emergency shelters that are part of Defendant's emergency shelter program receive funding from Defendant. Even though it does not receive direct funding, PGM shelter is part of the City's services, programs, or activities in that the City incorporates PGM into the City's intake and triage program for providing emergency shelter through its program. On information and belief, Defendant and

3

PGM shelter are engaged in a joint venture or the City's reliance on PGM shelter is the result of a close relationship with PGM shelter.

16. On information and belief, with the exception of the shelter called Sarah's Circle and maybe another shelter or two, the shelters funded by Defendant to participate in its emergency shelter program are inaccessible to individuals who cannot independently climb stairs.

17. On information and belief, the overwhelming majority of beds available through Defendant's emergency shelter program are in inaccessible buildings.

18. On information and belief, the lack of accessible beds results in a reduced likelihood of placement in a shelter for people with mobility-related disabilities than for people without such disabilities.

19. At the present time, Defendant funds a delegate agency, Catholic Charities, to provide transportation, triage, and placement of individuals and families in open shelter beds across the city as part of Defendant's emergency shelter program.

20. Catholic Charities' transportation, triage, and placement of individuals and families in open shelter beds across the city is part of the City's services, programs, or activities."

21. On information and belief, many, if not all, of the vans Catholic Charities uses to transport people experiencing homelessness to emergency shelters are not accessible to people with mobility disabilities.

22. Defendant's municipal operations constitutes a "program or activity" within the meaning of § 504 of the Rehabilitation Act. 29 U.S.C. § 794(b)(1).

## **THE MARTIN LAWSUIT**

23. On March 11, 2019, Laura Martin filed a complaint against the City and others in the United States District Court for the Northern District of Illinois, Case No. 19-cv-1709 (the "Martin Complaint").

24. The Martin Complaint alleged that the City denied Ms. Martin access to its homeless shelters because Ms. Martin's disability prevented her from climbing stairs and carrying her own luggage. The Martin Complaint further alleged that (1) Chicago's largest homeless shelter (PGM shelter) is inaccessible because it refuses to take people who cannot carry their own luggage; and (2) a shelter that purports to be accessible (Cornerstone Community Outreach) has an elevator that does not and never has worked.

25. The Martin Complaint also alleged that Ms. Martin only eventually found shelter by working outside the City's triage and referral system and going to Sarah's Circle on her own.

26. On information and belief, the City knows about the conditions of the shelters with which it coordinates.

27. If the City knows that its largest shelter is inaccessible, it should ensure that its smaller, accessible shelters are, in fact, accessible, or at least fix their accessibility problems promptly.

28. According to an August 27, 2019 Memorandum Opinion and Order from Judge Gettleman in Ms. Martin's action: "The City's failure to do so gives rise to a plausible inference that the City knows that people with disabilities are unable to access shelters, but cannot be bothered to act on that knowledge."

29. On information and belief, since the filing of the Martin complaint, the City has not made significant improvements to the physical accessibility of its emergency shelter program.

30. On November 18, 2019, the Court entered judgment in favor of Ms. Martin for $25,001.00 and against the City.

## THE APPLICABLE LAWS

A. **The Americans with Disabilities Act**

31. The ADA contains three substantive Titles that address discrimination in the areas of employment, public services, and public accommodations. Ms. Carter brings this complaint under Title II of the ADA, which governs public services and protects individuals from discrimination by public entities on the basis of their disability.

32. A public entity includes "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1).

33. The law governing Title II is found at 42 U.S.C. § 12101 *et seq*. and is codified at 28 C.F.R. § 35.101 *et seq*.

34. The ADA prohibits Defendant from discriminating against Ms. Carter or other individuals with disabilities based solely on their disabilities. 42 U.S.C. § 12132(a).

35. The ADA requires that Defendant, "in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability – [d]eny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service . . . ." 28 C.F.R. § 35.130(b)(1)(i).

36. The ADA also prohibits Defendant from providing "a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others . . . ." 28 C.F.R. § 35.130(b)(1)(ii).

37. Further, the ADA prohibits Defendant from providing "a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result or gain the same benefit, or to reach the same level of achievement as that provided to others . . . ." 28 C.F.R. § 35.130(b)(1)(iii).

38. The ADA prohibits Defendant from "directly or through contractual or other arrangements, utiliz[ing] criteria or methods of administration . . . [t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities . . . ." 28 C.F.R. § 35.130(b)(3)(ii).

39. The ADA requires Defendant to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).

40. Subject to certain exceptions not applicable here, "no qualified individual with a disability shall, because a public entity's facilities are inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity . . . ." 28 C.F.R. § 35.149.

**B. The Rehabilitation Act**

41. Section 504 of the Rehabilitation Act prohibits discrimination by recipients of federal funding against otherwise qualified individuals on the basis of their disabilities. 29 U.S.C. § 794.

42. The Rehabilitation Act and the ADA are functionally identical except that the Rehabilitation Act also requires proof of the receipt of federal funds. *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015).

## STATEMENT OF FACTS

43. Ms. Carter is a person with osteoarthritis. As a result, she is not able to climb stairs or independently enter a standard model van that has not been modified for use by people with disabilities.

44. Ms. Carter was evicted from her apartment about three years ago. From that time until August 15, 2019, Ms. Carter found shelter by sleeping on sofas in other people's homes, staying in a friend's car, or, when she has the money, staying in hotels.

45. Ms. Carter did not try to access the emergency shelter program until August 2019.

46. On August 11, 2019, Ms. Carter was admitted to Weiss Hospital because she had fluid in her legs that caused her skin to break open. She was released the afternoon of August 13, 2019.

47. On the morning of August 13, 2019, a social worker at Weiss Hospital called 311 to locate a shelter for Ms. Carter.

48. In response to that call, Defendant's delegate agency, Catholic Charities, promised to send a van to pick up Ms. Carter and take her to PGM shelter.

49. Ms. Carter waited for the van from Catholic Charities in the waiting room of the emergency room at Weiss Hospital from about 3 p.m., when she was discharged, to 12 a.m. Around midnight, the head security guard told her she could not wait for the van in the waiting room.

50. Ms. Carter waited outside the hospital for about an hour and a half, before returning to the emergency room. When she returned, another security guard told her she could stay there until the morning, but then she would have to leave.

51. The Catholic Charities van arrived between 1:30 a.m. and 2:00 a.m. on the morning of August 14, 2019.

52. Upon arrival, the driver from Catholic Charities helped Ms. Carter put her walker in the van but refused to help her get into the van.

53. Ms. Carter asked the driver whether he had a stepstool for the van. He did not. In addition, the handle to get into the van was broken. The driver told her that because she could not get in the van independently, he had to leave without her.

54. Ms. Carter asked the driver if there was an accessible van to take her to PGM shelter. The driver said there wasn't. He also told her that even if there were an accessible van, since she "refused service," they would not send another van. Ms. Carter responded by explaining that she was not refusing service, she simply could not get into the van because it was not accessible.

55. During the course of the conversation, the driver told her that PGM shelter had about 13 steps to get in, and asked if she could navigate those. Ms. Carter responded that she could not climb stairs.

56. After the driver left, Weiss Hospital would not let Ms. Carter back into the building. Since it was raining, Ms. Carter slept in a bus shelter across the street from the hospital.

57. When the buses started running in the early morning, she took a bus and went to Heartland Alliance Health Center ("Heartland"), not far from Weiss Hospital. Ms. Carter's primary care physician is at Heartland, so she went there to have a place to sit until she could figure out where to go next.

58. As Ms. Carter left the health center a few hours later, she ran into a woman in front of the building. She asked that woman whether she knew of a shelter nearby. The woman responded that she stayed at Sarah's Circle, a shelter located within the same building as Heartland.

59. Ms. Carter went back inside the building to Sarah's Circle and asked if they had a bed for her. She was told by the staff that they did not have a bed that night, but that she should call the next day at noon to see if there was a bed open for her.

60. On information and belief, the staff at Sarah's Circle went above and beyond the triage and intake system operated by Defendant when offering to work directly with Ms. Carter in her effort to find shelter instead of referring her back to the 311 line Defendant operates and the social worker at Weiss Hospital used.

61. Ms. Carter spent the night of August 14, 2019, in her friend's car.

62. The next morning, August 15, 2019, Ms. Carter went back to Heartland to call Sarah's Circle. She called around 9 a.m. Sarah's Circle told her there was a bed available for her that night. A Sarah's Circle staff member told her to come up before 6 p.m., that she was only entitled to bring two bags, and that she needed identification to be able to stay there.

63. Ms. Carter went there immediately. A staff member at Sarah's Circle told her that a bed would open up around lunchtime.

64. Except when her medical care required her to spend a night in a hospital, Ms. Carter has stayed at Sarah's Circle from that time up to the filing of this Complaint.

65. When admitted to Sarah's Circle's shelter, Sarah's Circle staff told Ms. Carter that her stay could not exceed six months, and that she would have to leave no later than

February 14, 2020. As of the filing of this Complaint, the February 14, 2020 deadline has not been extended.

66. As of the filing of this Complaint, Ms. Carter has no housing or shelter available to her when the February 14 deadline arrives tomorrow.

67. On information and belief, Defendant's emergency shelter program remains as inaccessible to Ms. Carter as it was in August of 2019.

68. Since Ms. Carter is experiencing homelessness and in need of shelter once she leaves Sarah's Circle, she faces the imminent threat of being denied access to the City's emergency shelter system.

69. On information and belief, the City knows that its shelters are disproportionately likely to turn away people with disabilities, and the City nonetheless failed to fix that disparity.

## COUNT I

### DISCRIMINATION UNDER § 504 OF THE REHABILITATION ACT

70. Paragraphs 1 – 69 above are incorporated as if set forth fully herein.

71. Section 504 of the Rehabilitation Act prohibits discrimination against otherwise qualified individuals on the basis of their disabilities by recipients of federal funding. *See* 29 U.S.C. § 794.

72. Under Section 504, entities receiving federal financial assistance must make reasonable accommodations in their rules, policies, and practices when necessary to avoid discriminating against a person on the basis of a disability.

73. Defendant receives federal funding and is subject to the requirements of Section 504.

74. Ms. Carter is a person with a disability[1] within the meaning of Section 504.

75. Section 504 also prohibits Defendant from segregating individuals with disabilities and requires Defendant to ensure that people with disabilities receive services in the most integrated setting possible.

76. Defendant's decision to fund shelters in the current manner renders Defendant's emergency shelter program inaccessible to Ms. Carter and other individuals with mobility disabilities.

77. Defendant's decision to operate a shelter program in the current manner renders Defendant's emergency shelter program inaccessible to Ms. Carter and other individuals with mobility disabilities.

78. Defendant's acts and omissions constitute a violation of Ms. Carter's rights under Section 504. Defendant's conduct constitutes an ongoing and continuous violation of Section 504 and unless restrained and enjoined from doing so, Defendant will continue to violate Section 504. Defendant's acts and omissions, unless enjoined, will continue to inflict irreparable injuries for which Ms. Carter has no adequate remedy at law.

79. Defendant's acts and omissions were made with deliberate indifference to Ms. Carter's right to be free from discrimination on the basis of her disability under § 504.

## COUNT II

**DISCRIMINATION UNDER THE AMERICANS WITH DISABILITIES ACT**

80. Paragraphs 1 – 69 above are incorporated as if set forth fully herein.

---

[1] Section 504 uses the term "handicapped" which is disfavored. Disabled has the same legal meaning as "handicapped" under Section 504.

81. Title II of the ADA prohibits discrimination against individuals with disabilities and extends the non-discrimination rule of Section 504 of the Rehabilitation Act to services provided by any public entity. *See* 42 U.S.C. § 12132.

82. Under the ADA, public entities must provide reasonable modifications when a policy, practice, or procedure discriminates on the basis of disability. Public entities must also make reasonable accommodations in their rules, policies, and practices when necessary to avoid discriminating against a person on the basis of a disability.

83. The ADA prohibits Defendant from segregating individuals with disabilities.

84. Defendant is a public entity subject to the requirements of the ADA.

85. Ms. Carter is a qualified individual with a disability within the meaning of the ADA.

86. Defendant's decision to fund shelters in the current manner renders Defendant's emergency shelter program inaccessible to Ms. Carter and other individuals with mobility disabilities.

87. Defendant's decision to operate a shelter program in the current manner renders Defendant's emergency shelter program inaccessible to Ms. Carter and other individuals with mobility disabilities.

88. Defendant's acts and omissions constitute a violation of Ms. Carter's rights under the ADA. Defendant's conduct constitutes an ongoing and continuous violation of the ADA and unless restrained and enjoined from doing so, Defendant will continue to violate the ADA. Defendant's acts and omissions, unless enjoined, will continue to inflict irreparable injuries for which Ms. Carter has no adequate remedy at law.

89. Defendant's acts and omissions were made with deliberate indifference to Ms. Carter's right to be free from discrimination on the basis of her disability under the ADA.

## RELIEF SOUGHT

WHEREFORE, Plaintiff Gloria Carter requests that this Court:

A. Declare that Defendant's operation of its emergency shelter program violates the ADA and the Rehabilitation Act by failing to make the emergency shelter program accessible to Ms. Carter and others with mobility disabilities;

B. Declare that Defendant's choices in funding partners in its emergency shelter program violate the ADA and the Rehabilitation Act by failing to provide a system that is accessible to Ms. Carter and others with mobility disabilities;

C. Enter a preliminary and permanent injunction against Defendant, ordering it to:

1. Operate its emergency shelter program so that it is accessible to Ms. Carter and others with mobility disabilities; and

2. Direct funding to partner organizations in such a way that the emergency shelter program is accessible to Ms. Carter and others with mobility disabilities;

D. Award Ms. Carter compensatory damages in an amount to be proven at trial;

E. Award Ms. Carter reasonable costs and attorneys' fees; and

F. Grant such other relief as this Court deems just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiff Gloria Carter demands a jury trial on all issues properly triable by a jury.

Dated: February 13, 2020          Respectfully Submitted,

**GLORIA CARTER**,

/s/ Robert N. Hermes
By One of Her Attorneys

Robert N. Hermes
Andrew D. Shapiro
**Porter, Wright, Morris, & Arthur LLP**
321 North Clark Street, Suite 400
Chicago, Illinois 60654
Phone: (312) 756-8500
Fax: (312) 873.4373
rhermes@porterwright.com
ashapiro@porterwright.com

Charles R. Petrof
Mary Rosenberg
Kenneth M. Walden
**Access Living of Metropolitan Chicago**
115 W. Chicago Ave.
Chicago, Illinois 60654
Phone: (312) 640-2124
Fax: (312) 640-2139
TTY: (312) 640-2169
cpetrof@accessliving.org
mrosenberg@accessliving.org
kwalden@accessliving.org

Patricia Nix-Hodes
Diane O'Connell
Arturo Hernandez
**Law Project of the Chicago Coalition for the Homeless**
70 East Lake Street, Suite 720
Chicago, Illinois 60601
Phone: (312) 641-4140
Fax: (312) 641-4144
patricia@chicagohomeless.org
diane@chicagohomeless.org
arturo@chicagohomeless.org

13119492